**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

ERIN MERRIWEATHER,

                 Plaintiff,

      -against-

CROTHALL HEALTHCARE, INC.,

                 Defendant.

-------------------------------------------------------X

**DECISION & ORDER**

17 Civ. 653 (PED)

**PAUL E. DAVISON, U.S.M.J.:**

       The plaintiff, Erin Merriweather ("Plaintiff"), brings this personal injury action against the defendant, Crothall Healthcare, Inc. ("Defendant"), alleging that she was injured as a result of Defendant's negligence in maintaining the safety of a birthing suite at Plaintiff's place of employment, Good Samaritan Hospital ("GSH"). This case is before me for all purposes on consent of the parties pursuant to 28 U.S.C. § 636(c). Dkt. 23. Presently before this Court is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure: Dkts. 43 (Defendant's motion), 48 (Defendant's memorandum of law), 52 (Plaintiff's opposition), and 54 (Defendant's reply).

       For the reasons that follow, Defendant's motion for summary judgment is **GRANTED.**

## I.    BACKGROUND

       The following facts are gathered from the parties' statements pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York, from the pleadings, and from affidavits, affirmations, and exhibits submitted by the parties in support of their contentions. Any disputes of material fact are noted.

On September 6, 2016, at approximately 2:30 a.m., Plaintiff, a maternity technician at GSH in Suffern, New York, slipped and injured her knee in a birthing suite of the labor and delivery unit. Following the accident, Plaintiff sought and received worker's compensation benefits from GSH, thus precluding any further recovery in a civil action against GSH. *See Hastings v. Trinity Broad. of New York, Inc.*, 130 F. Supp. 2d 575, 576–77 (S.D.N.Y. 2001). There were no witnesses, other than Plaintiff, to the accident. The birthing suite had been used for a delivery earlier that same night, but it was unoccupied at the time of the accident.

Following deliveries, housekeepers employed by Defendant cleaned and disinfected the birthing suites at GSH. At some point after the previous patient left the subject birthing suite, Plaintiff saw a housekeeper enter the suite with cleaning supplies, including a mop. Plaintiff did not observe what took place inside the suite.

Approximately one hour after Plaintiff observed the housekeeper enter the suite and a housekeeping cart outside of the suite, Plaintiff entered the suite to check that the room was clean and ready for the next patient. Plaintiff testified that a wet floor sign was not in the doorway when she entered the suite.

Plaintiff walked approximately 16 feet into the room with no difficulty and did not observe any "streaking or any water on the floor prior to slipping." Dkt. 44-2 at 9-10. Plaintiff slipped near the patient bed and caught herself by grabbing the bed prior to making contact with the ground. After she slipped, Plaintiff noticed clear streaks on the floor around the bed. Plaintiff concluded that the streaks were the result of mopping done by the housekeeper she observed enter the suite an hour earlier. Defendant asserts that the mopping occurred one hour prior to her entering the room, but Plaintiff counters that she observed the housekeeper *enter* the suite an hour earlier, not that the mopping occurred an hour earlier.

Plaintiff reported her accident to the charge nurse, Kristen Magnanini, and asked to visit the emergency room to have her knee examined. Plaintiff was escorted to the emergency room in a wheelchair where she was seen and provided medication. She then walked to the maternity ward to inform the charge nurse that she was leaving. Prior to leaving, Plaintiff walked to the supervisor's office, filled out an accident report, and believes she informed the nursing supervisor about the streaks in the birthing suite.

Magnanini testified that Plaintiff informed her that Plaintiff slipped on mineral oil near the bathroom and, initially, Plaintiff said she was not injured and returned to work. Plaintiff later requested to go to the emergency room. Plaintiff contends that she did not advise Magnanini that she slipped solely on mineral oil. Magnanini further testified that within 15 minutes after learning of Plaintiff's accident, she inspected the suite, did not observe any slippery substance on the floor, and the suite appeared clean.

Plaintiff made an appointment for later the same day of the accident with Northeast Orthopedics. At her appointment, Plaintiff completed a "Visit Details" sheet in which she described the accident as follows: "Slipped on floor, (oil was on floor) felt pop in knee." Dkt. 44-7 at 5. Plaintiff again does not concede that the mopped streaks were solely comprised of one substance.

In Plaintiff's response to Defendant's requests for admissions, Plaintiff denied that the substance she slipped on was oil, denied knowing at or around the time of her accident that the substance she slipped on was oil, and denied she reported to co-workers that what she had slipped on was oil. *Id.* at 2. Following each denial, Plaintiff added, "Defendant had mopped the floor." *Id.* In response to Defendant's request that Plaintiff admit that the oil on the floor was mineral oil used by hospital personnel, Plaintiff could neither admit nor deny knowledge of the

3

oil referenced by Defendant. *Id.* at 3. It is unclear from this exhibit whether Plaintiff was denying the presence of oil on the floor or denying that the hazard was solely comprised of oil.

GSH Charge Nurse, Skye Guerra, was working in the labor and delivery unit at the time of the accident. After Guerra was informed of the accident, approximately 20 minutes after it occurred, she spoke directly with Plaintiff. Guerra testified that Plaintiff informed her that Plaintiff slipped near the bathroom inside the birthing suite. Guerra did not observe the birthing suite after the accident, but she testified that she inspected the suite approximately one hour prior to learning of the accident in order to confirm that the suite was clean and ready for a new patient. No other patients were admitted into this suite between her inspection and Plaintiff's accident. Plaintiff concedes that this was Guerra's testimony but asserts that it was Defendant's responsibility to ensure that the room was clean.

Guerra also testified that when she inspected the room, it had already been cleaned and the floor was clean and dry. She testified that there was a wet floor sign in the doorway, and she removed the sign from the doorway as she entered the suite. Guerra did not observe any oil on the floor of the suite, and she testified that Plaintiff never told her that Plaintiff had slipped on oil.

### a. Testimony Regarding Housekeeping Protocol

Sean McManus, Defendant's Director of Environmental Services (*i.e.*, housekeeping), testified that after a patient was transported out of a birthing suite, GSH personnel would notify Defendant personnel that the suite needed cleaning. After receiving notification, a housekeeper employed by Defendant would clean and disinfect the suite, including wiping down surfaces, sweeping, and mopping the floor. McManus testified that the housekeepers mopped using a standard mop and a mixture of water and clear disinfectant solution, which were pre-mixed.

GSH Manager Margaret Moore, the acting manager of the labor and delivery unit at the time of the accident, testified that although "a lot of other stuff" could wind up on the floor of a birthing suite, it was uncommon for oil to get on the floor during labor and delivery. Dkt. 44-6 at 6. However, she also testified that mineral oil is used, though rarely, in the birthing process. *Id.* at 4.

McManus also testified that the housekeepers placed wet floor signs in the doorway of a birthing suite prior to cleaning, which were left in place throughout the cleaning. The housekeepers left the wet floor sign in the doorway after cleaning a suite in order to allow the floor to air dry. While there was no specific timeframe for when to remove the wet floor sign, the suite was inspected to confirm the floor was dry prior to removal; by whom the suites are to be inspected is disputed and discussed *infra*. Plaintiff and Ms. Guerra both testified that GSH personnel would check the rooms to confirm they are clean and ready for a new patient. Plaintiff admits this is the general policy but does not concede that the subject birthing suite was clean at the time of her accident.

While Nurse Magnanini testified that it usually takes a housekeeper less than 30 minutes to clean a birthing suite, McManus testified that it takes between 30 and 45 minutes. McManus also testified that it generally takes less than five minutes for the floor-cleaning solution to dry.

Plaintiff admits that she does not know what cleaning supplies are used by housekeepers in the birthing suites, has never observed a housekeeper cleaning a birthing suite, and does not know the procedures housekeepers followed to clean the suites other than that they were supposed to set out caution signs.

Nurse Guerra testified that GSH personnel control access and provide security within the hospital, including within the labor and delivery unit. Magnanini also testified that GSH

personnel control access to the labor and delivery unit. Guerra further testified that, during deliveries, equipment is placed under the patient to catch and retain any fluids from the procedure and, in the rare event that fluid ended up on the floor, GSH personnel would usually put a towel down on the fluid. GSH nurses often stripped the patient beds before housekeeping entered to clean the room. As noted *supra*, after housekeeping cleaned the suite, GSH personnel would inspect the room to confirm it was ready for reuse. Between deliveries, birthing suite doors were left open, and the rooms were accessible to anyone working in the labor and delivery unit. If Guerra had any issues with the cleanliness of the suite, she would contact the housekeeper or the housekeeper's supervisor, also an employee of Defendant, to request additional cleaning. Magnanini testified that as a housekeeper was cleaning a suite, a wet floor sign would be left in the doorway and the sign would be left there when the housekeeper had finished and left the room, but Plaintiff does not concede that this protocol was followed at or around the time of the subject accident. Magnanini also testified that between patients, birthing suites would be restocked by maternity technicians. Plaintiff concedes that the preceding was Guerra's and Magnanini's testimony but maintains that it was Defendants' responsibility to ensure that the room was clean.

## II.    MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'") (quoting former Fed. R.

6

Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323-24). To defeat a motion for summary judgment, the nonmovant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). "Assessments of credibility and choices between conflicting versions of the events

are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted). "[T]he judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 553 (quoting *Anderson*, 477 U.S. at 252).

## III. DISCUSSION

Defendant argues that GSH has a non-delegable duty to maintain the safety of its premises and, as Defendant is not the property owner or a lessee, it does not owe a common law duty of care to Plaintiff. Additionally, Defendant argues that it does not owe a duty under any of the three exceptions to this general rule outlined in *Espinal v. Melville Snow Contractors, Inc.*, 98 N.Y.2d 136, 142 (2002). Plaintiff contends that Defendant either caused or exacerbated the hazardous condition which caused her accident and entirely displaced GSH's duty to maintain the safety of the premises.

"Under New York law, the breach of a contractual obligation to render services does not generally give rise to tort liability in favor of a non-contracting third-party." *Doona v. OneSource Holdings, Inc.*, 680 F. Supp. 2d 394, 402 (E.D.N.Y. 2010) (citing *Espinal*, 98 N.Y.2d 136). However, in *Espinal*, the New York Court of Appeals identified "three situations in which a party who enters into a contract to render services may be said to have assumed a duty of care-- and thus be potentially liable in tort--to third persons: (1) where the contracting party, in failing to exercise reasonable care in the performance of his duties, 'launche[s] a force or instrument of harm;' (2) where the plaintiff detrimentally relies on the continued performance of the contracting party's duties and (3) where the contracting party has entirely displaced the other party's duty to maintain the premises safely." 98 N.Y.2d at 140 (internal citations omitted).

Plaintiff does not contend that she detrimentally relied on Defendant's performance of its duties under the contract but, as discussed, does contend that Defendant launched a force or instrument of harm and entirely displaced GSH's duty to maintain the premises safely. I address each contention in turn.

### a. Launching a Force or Instrument of Harm

Defendant argues that Plaintiff cannot prove that Defendant affirmatively launched the force or instrument of harm that caused Plaintiff to slip. Defendant contends that although Plaintiff alleges she saw clear streak marks on the floor after she slipped, Plaintiff did not see what happened in the room with the housekeeper and there were no other witnesses who saw the alleged hazard. Defendant asserts that Plaintiff's conclusion that her slip was caused by "one-hour-old mop solution" was speculative, and, even if accepted as true, Defendant's housekeeper set out a wet-floor caution sign in the doorway.

Plaintiff, on the other hand, argues that there is ample evidence that Defendant affirmatively created the slippery floor condition. This evidence includes the fact the Plaintiff observed mopping streaks after she slipped, she saw the housekeeper enter the birthing suite with a mop and cart approximately one hour prior to the accident, and it reportedly takes 30 to 45 minutes for the housekeeper to clean a birthing suite. Additionally, Plaintiff contends that it is of no importance what substance was on the floor "insofar as the substance(s) were either created or spread by the defendant's housekeeper." Dkt. 52 at 3.

A contractor "who 'undertakes to render services and then negligently creates or exacerbates a dangerous condition may be liable for any resulting injury.'" *Doona*, 680 F. Supp. 2d at 402 (quoting *Espinal,* 98 N.Y.2d at 141-42). However, simply failing to completely remedy an existing dangerous condition, "such that some residue remains, is not sufficient to

meet the 'launche[s] a force or instrument of harm' standard." *Haskin v. United States*, No. 10 Civ. 5089 (MKB), 2015 WL 3971730, at *12 (E.D.N.Y. June 30, 2015) (citing *Espinal*, 98 N.Y.2d at 141–42); *see also Church v. Callahan Indus.*, 99 N.Y.2d 104, 111-12 (2002) (although the contractor breached its contractual duty by failing to install a guardrail along a highway, the dangerous condition already existed, and the contractor's contractual breach did not exacerbate the condition). "[E]vidence in the record must support some theory as to how the defendant's behavior led to the dangerous condition; mere speculation about whether a failure to perform . . . rendered a property less safe than it was prior to removal efforts is insufficient to withstand summary judgment." *Haskin*, 2015 WL 3971730, at *12.

The facts in *Espinal* are instructive on this issue. In *Espinal*, the plaintiff slipped and fell due to icy conditions in her employer's parking lot and sued the company under contract to plow and remove snow from the premises. 98 N.Y.2d at 137-38. The plaintiff argued that the snow removal company launched a force or instrument of harm by "creat[ing] a 'dangerous icy condition' or 'increas[ing] the snow-related hazard which caused plaintiff to slip and fall.'" *Id.* at 142. However, the Court noted that "[m]issing from plaintiff's complaint, bill of particulars or opposition to [the defendant]'s summary judgment motion is any support for these allegations," and that the plaintiff "point[ed] only to the testimony of [the defendant]'s former corporate secretary . . . who stated that snow plowing operations can sometimes leave 'residual snow or ice' on the plowed area and that failure to sand and salt the area could possibly cause snow to melt and refreeze." *Id.* The Court concluded that "[b]y merely plowing the snow [as required by the contract], [the defendant] cannot be said to have created or exacerbated a dangerous condition." *Id.*

Here, Plaintiff has similarly failed to provide any support—other than Plaintiff's speculation that she slipped on a mixture of mop water and some type of oil or other substance spread around by Defendant's housekeeper—for her contention that Defendant created or exacerbated a dangerous condition. Moreover, no evidence has been presented demonstrating that oil or other slippery substances were ever used while cleaning the birthing suite by Defendant's housekeepers. In fact, there is testimony to the contrary. McManus testified that oil is not used in Defendant's cleaning process. Dkt. 44-3 at 13. And although GSH Manager, Ms. Moore, testified that mineral oil is used in the birthing process, she specified that it is rarely used and that it would be unusual for it to end up on the floor. Dkt. 44-6 at 4, 6. Plaintiff is unable to identify the nature or origin of the dangerous condition or, consequently, if mopping over this unidentified condition could somehow make it *more* dangerous. Indeed, as Defendant argues, the housekeeper's actions were just as likely to have improved any existing dangerous condition. By merely mopping the birthing suite and placing a wet floor sign in the doorway as required under the contract, Defendant cannot be said to have created or exacerbated a dangerous condition absent pure speculation. *See Espinal*, 98 N.Y.2d at 142.

Plaintiff, citing *Irizarry v. 1915 Realty*, 135 A.D.3d 411 (2016) ("*Irizarry II*") and *Brown v. Simone Development Co.*, 83 A.D.3d 544 (2011), argues that she is entitled to a favorable inference that Defendant launched the harm. In *Irizarry II*, "rather than rely on speculation as to causation, plaintiff's theory [was] based upon her observation that the condition was soapy, dirty, and wet, resembling what one would see when using a dirty mop, and the presence of a mop, bucket, and 'wet floor' sign in the nearby lobby." 135 A.D.3d at 411–12.

However, the facts in *Irizarry II* are distinguishable from the instant case. Here, the fact that the floors were mopped at some point prior to the accident is not in dispute. In *Irizarry II*,

the defendant's superintendent denied mopping the stairs on which the plaintiff slipped and fell. *Id.* at 411. After descending the stairs, the plaintiff observed a mop, bucket, and wet floor sign in the nearby lobby. *Id.* at 412; *see also Irizarry v 1915 Realty LLC*, No. 3016682013, 2014 WL 4626552, at *1 (N.Y. Sup. Ct. Aug. 12, 2014) ("*Irizarry I*"). This raised a triable issue of fact as to whether the floor was indeed mopped prior to the accident. *Irizarry II*, 135 A.D.3d at 411. Notably, the sign was not located on the allegedly wet stairs and apparently was not visible to the plaintiff as she descended the stairs. *See id.* at 411-12; *Irizarry I*, 2014 WL 4626552, at *1. Moreover, the plaintiff was suing the owner of the property and the case did not raise the issue of contractor liability. *Id.*

Here, the dispute is not whether the floor of the birthing suite was mopped at some point prior to the accident, but whether the mopping created, or exacerbated, a dangerous condition. Moreover, as discussed, Defendant's housekeeper placed a warning sign in the doorway, and the sign was subsequently removed by a GSH employee prior to the accident.

In *Brown*, the plaintiff alleged, *inter alia*, that the plaintiff slipped in water, no warning sign was set out, and an employee of the defendant was standing nearby with a mop and bucket. 83 A.D.3d at 544-45. A witness also testified that he had previously seen an employee of the defendant mop the lobby at around the time the accident occurred. *Id.* at 445. As in *Irizarry*, *supra*, this evidence presented triable issues as to whether the defendant created the hazardous condition. *Id.* While *Brown* did involve a lawsuit against a party contracted to clean the employer's facility, it presented, similar to *Irizarry*, an issue of whether a defendant employee, who denied mopping the floor prior to the accident, in fact mopped the floor and created the hazardous condition. *Id.* Additionally, the defendant in *Brown* allegedly failed to set out a wet floor caution sign. *Id.*

12

Here, Plaintiff saw Defendant's housekeeper enter the birthing suite with a mop approximately an hour prior to her accident. Plaintiff also contends, based on McManus' testimony, that it can take a housekeeper 30-45 minutes to clean a birthing suite. Thus, it is at least within the realm of possibility that the floor still could have been wet when Plaintiff entered the suite. However, even if the floor was still wet, any theory that Plaintiff was injured because Defendant created the hazard by mopping would necessarily entail the negligent act of a GSH employee removing the wet floor sign prior to the floor having dried, thus breaking the chain of causation. On the other hand, as discussed, Plaintiff also argues that Defendant could have exacerbated an existing condition created by GSH employees by mopping over some unidentified substance, or mixture of substances, that ended up on the floor during the birthing process. Without knowing the nature of the alleged preexisting dangerous condition, it is impossible to determine whether Defendant's mopping improved, exacerbated, or made no change to the condition. Moreover, this theory would require that the GSH employee who removed the wet floor sign had no duty to inspect the room prior to removing the sign. Even assuming this is the case, Plaintiff's argument that Defendant exacerbated a dangerous condition in the suite by mopping over an unidentified substance relies on pure speculation, which cannot defeat summary judgment.

As Defendant correctly notes, the Second Circuit, in *Mehra v. Bentz*, 529 F.2d 1137, 1139 (2d Cir. 1975), found that "[t]he rule in New York is that, while inferences of negligence may be drawn from circumstantial evidence, those inferences must be the only ones which *reasonably could be drawn* from the evidence presented. If the circumstantial evidence presented lends itself equally to several conflicting inferences, the trier of fact is not permitted to

13

select the inference it prefers, since to do so would be the equivalent of engaging in pure speculation about the facts."

Accordingly, as a fair-minded jury could not find that Defendant created or exacerbated a dangerous condition, the "launche[s] a force or instrument of harm" *Espinal* exception is not satisfied here.

### b. Entirely Displacing GSH's Duty to Maintain the Premises Safely

Defendant next argues that Plaintiff cannot prove that Defendant totally displaced GSH's role in maintaining the premises. Defendant asserts that GSH personnel played an active role in servicing the birthing suites between deliveries, including stripping the sheets, placing towels on wet floor areas, requesting and inspecting cleanings, and removing warning signs when rooms were ready for a new patient.

Plaintiff contends that the housekeeper was an employee of Defendant and that Defendant admits that it was "their sole responsibility to mop and inspect the subject floor as well as their responsibility to place and remove caution signs." Dkt 52 at 2 (citing McManus' deposition testimony, discussed *infra*). Thus, Plaintiff argues, genuine issues of material fact exist with respect to the duty of care Defendant owed to Plaintiff and whether Defendant entirely displaced the duties of GSH in terms of housekeeping responsibilities.

Defendant avers that the contract between GSH and Defendant must be "a comprehensive and exclusive set of obligations which the parties could have reasonably expected to displace the owner's duty to maintain the premises safely," and a contractor cannot be liable if the premises owner "reserved for itself a significant amount of control over the maintenance of the premises." *Hagen v. Gilman Mgmt. Corp.*, 4 A.D.3d 330, 331 (2004). Defendant also contends that New York courts have repeatedly held that the provision of housekeeping-related services alone is

14

insufficient, citing *Schmidt v. Promaster Cleaning Serv., Inc.*, 281 A.D.2d 468 (2001). It is not clear from the terse opinion in *Schmidt* whether the contracted services there were similar to those in the instant case. Moreover, *Schmidt* predated *Espinal*, which clarified situations in which a contracting party could entirely displace another party's duty. However, it is the case that "[t]he third exception, displacing the other contracting party's duty to maintain the premises safely, arises when the agreement is comprehensive and exclusive, such that it constitutes more than a limited undertaking," and "[i]n general, this requires more than just janitorial services." *Doona*, 680 F. Supp. 2d at 403.

Additionally, Defendant notes that multiple GSH nurses testified that they play a role in directing and coordinating the housekeeping work. During overnight shifts, when Plaintiff's injury occurred, the nurses would also perform the initial cleaning of the rooms themselves, Dkt. 53 ¶¶ 37, 47, and inspect the rooms after housekeeping was completed, *id.* at ¶ 38. Moreover, no housekeepers were assigned to the labor and delivery unit during overnight shifts, and a nurse would either notify housekeepers if additional cleaning was needed after inspection or remove wet floor warning signs from the doorways of rooms that were sufficiently cleaned. *Id.* at ¶¶ 40, 52, 54, 55. Plaintiff only appears to dispute these assertions to the extent she claims that Defendant's housekeepers were solely responsible for inspecting the birthing suites and removing the warning signs. I address Plaintiff's claims below.

Plaintiff relies almost exclusively on *Santorelli v. Crothall Servs. Grp., Inc.*, No. 15 Civ. 978 (NG)(RLM), 2017 WL 728227 (E.D.N.Y. Feb. 23, 2017) and argues that *Santorelli* previously rejected all of Defendant's arguments here. The facts in *Santorelli* are similar, but not identical, to the instant case. There, a nurse slipped and fell in a healthcare facility where she was employed shortly after another employee of the healthcare facility had mopped the floor and

allegedly failed to set out a wet floor sign. *Id.* at 1. The majority of the Court's discussion in *Santorelli* focused on the relationship between the healthcare facility and the defendant Crothall—this is not at issue here. In *Santorelli*, Crothall entered into an agreement with the healthcare facility to provide managers to oversee the healthcare facility's cleaning staff. The Court decided that issues of fact remained as to whether the healthcare facility's employee was a "special employee" of Crothall before discussing the issues relevant to this case. *Id.* at 8.

With respect to the "total displacement" of the healthcare facility's duty to maintain the premises, the Court concluded that a material issue of fact remained. *Id.* at 10. The Court reasoned that although the healthcare facility "dictated how and when certain cleaning tasks were to be done[,] . . . Crothall was responsible for the day-to-day operation of the housekeepers," and the plaintiff "'was among those limited individuals whose safety came within the scope of defendant's contractual obligations,' and injury to her from Crothall's 'failure to fulfill those obligations was assuredly foreseeable.'" *Id.* (quoting *Tushaj v. Elm Mgmt. Assoc.*, 293 A.D.2d 44, 48 (1st Dept. 2002)).

Here, GSH employees notify Defendant's housekeepers when a suite needs to be cleaned, inspect the suite after it is cleaned, request additional cleaning if necessary, and, at least in the instant case, remove the wet floor sign after the floor has dried. Additionally, GSH employees testified that GSH personnel control access and provide security within the hospital, including within the labor and delivery unit. Moreover, GSH employees would, on occasion, place towels over fluids that ended up on the floor during deliveries and strip the patients' beds. Defendant's housekeepers, on the other hand, were responsible for cleaning and disinfecting the suite, including wiping down surfaces, sweeping the floor, and mopping the floor; and they placed wet

floor signs in the doorway of a birthing suite prior to cleaning, which were left in place throughout the cleaning and until the floor was dry.

In her submissions, Plaintiff argues that Defendant "admits that it was their sole responsibility to mop and to inspect the subject floor as well as their responsibility to place and remove caution signs" despite testimony to the contrary from GSH nurses. Plaintiff cites to three pages of McManus' testimony without providing any explanation as to how this amounts to such an admission. McManus' testimony reads as follows:

> Q: What protocol was in effect as of September 6th, 2016 in terms of keeping individuals out of a room until a floor was air dried?
>
> A: Protocols for keeping people out? I don't understand the question.
>
> Q: When the housekeeping employee was done cleaning and disinfecting the room including the floor
>
> A: Uh-hum.
>
> Q: -- where were they supposed to go?
>
> A: They would leave the suite.
>
> Q: At that point would they take away the sign that was at the entrance to the door?
>
> A: No, they shouldn't until the floor is dry.
>
> Q: How, if at all, would they know when to come back to remove the sign that would be at the entrance to the labor and delivery suite?
>
> A: You know, it's like two to three minutes for the floor to dry and then just pick it up. They have several floor signs, so.
>
> Q: So they would leave the room and come back two or three minutes later to pick up the sign?
>
> A: Or just leave the sign there, yeah.
>
> Q: Was there a specific policy that they were supposed to follow in terms of that, referring to the housekeeping employees?

A: Yeah, when you clean the room you put the wet floor sign down, you sweep, mop, disinfect, yup.

Q: Was there a policy that they were supposed to follow in terms of retrieving the signs?

A: No.

Q: Were there any type of cleaning oils used to treat the wood floors within the labor and delivery suites?

A: Oil, they don't use oils, we don't have it.

Q: Again, referring back to September 2016?

A: Yeah, they have disinfectant, they have cleaners, they don't have oils of any kind.

Q: Before a housekeeping employee would remove the sign that they had placed in front of the room, were they supposed to walk into the room to make sure the floor was dry?

A: Well, it's more of kind of an eyesight thing. When you sweep and mop the room you leave it as is and then you check it, but there's no real protocol as to retrieving the floor sign because they have several. They should have three to four signs and that's, they are constantly cleaning, so.

Q: But were they supposed to check the actual room to ensure that the floor was dry before they left with the sign?

A: No, no, it's standard. They sweep, mop the floor, three minutes later, four minutes later the floor is dry.

Q: If there were any type of oils or other substances left on the floor were the housekeeping employees responsible for removing those items before the room was to be used again?

A: Yes, absolutely, that's what they have to do.

Dkt. 44-3 at 12-14.

This testimony does not support Plaintiff's argument that Defendant admitted it was the housekeepers' sole responsibility to inspect the rooms and remove warning signs. Indeed,

McManus seems to suggest that it was not their responsibility to check that the floor was dry or remove the caution signs. Moreover, GSH personnel testified that they inspected the rooms to verify they were dry and removed the warning signs. Dkt. 53 at 7, 8, 11, 12. Plaintiff also testified that GSH staff would inspect the room to confirm it was clean and ready for the next patient. Dkt. 53 at 2. My determination that Plaintiff has failed to demonstrate this purported admission by Defendant, and the fact that GSH employees direct when certain cleaning tasks are to be done and inspect the suites—facts similar to those in *Santorelli*, 2017 WL 728227, at *10—does not end the analysis, however.

Questions remain as to whether a factual dispute exists pertaining to Defendant's responsibility for the day-to-day operations of the housekeepers, whether Plaintiff is "among those limited individuals whose safety came within the scope of defendant's contractual obligations," and whether her injuries resulting from Defendant's alleged failure to fulfill those obligations was foreseeable. *See id.* Indeed, Defendant's responsibility over the housekeeper's day-to-day operations is clearer here than in *Santorelli* as the housekeepers are employees of Defendant rather than of the hospital. On the other hand, it is undisputed that GSH staff removed the wet floor sign prior to Plaintiff's accident; thus, the question boils down to whether Defendant displaced GSH's duty to inspect the birthing suite prior to removing the sign. *Espinal* is again instructive on this issue.

In *Espinal*, the express terms of the contract provided that the defendant "was obligated to plow only when the snow accumulation had ended and exceeded three inches," and the Court held that "[t]his contractual undertaking is not the type of 'comprehensive and exclusive' property maintenance obligation contemplated . . . . [The defendant] did not entirely absorb [the landowner]'s duty . . . to maintain the premises safely." 98 N.Y.2d at 141. Although neither

party has provided the Court with the contractual agreement between Defendant and GSH, as noted, this *Espinal* exception generally requires more than just janitorial services. *Doona*, 680 F. Supp. 2d at 403. Moreover, having resolved all ambiguities and drawn all permissible factual inferences concerning testimony in the record about the respective duties of Defendant and GSH in favor of Plaintiff, I find that GSH retained its duty to inspect the birthing suites prior to removing wet floor signs and, thus, Defendant did not entirely absorb GSH's duty to maintain the premises safely.

Accordingly, Defendant did not owe a duty of care to Plaintiff.

### c. Breach of Duty of Care

Finally, Defendant argues that even if Plaintiff can establish an *Espinal* exception, Defendant's alleged conduct did not breach its contractual duty. Having found that Defendant does not owe a duty to Plaintiff in this case, I need not address this argument. However, even assuming *arguendo* that Defendant owed a duty, the discussion *supra* regarding creating or exacerbating a dangerous condition applies equally here. Indeed, "[p]aradoxically . . . , this [is] the rare case in which the question of whether the defendant *breached* a duty may be determinative of whether, as a matter of law, there arose an actionable duty in the first instance." *Doona*, 680 F. Supp. 2d at 402.

Accordingly, Defendant did not owe, and did not breach, a duty of care to Plaintiff.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED**.


The Clerk of the Court is respectfully directed to terminate the pending motion (Dkt. 43), to enter judgment in favor of Defendant, and to close the case.

Dated: December 2, 2019
White Plains, New York

**SO ORDERED**

_____
PAUL E. DAVISON, U.S.M.J.